# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

PARAGON COMPONENT SYSTEMS, LLC,   )
 )
     Plaintiff,   )     CIVIL ACTION NO.:
 )     1:24-CV-00246-CEA-CHS
v.   )
 )
QUALTIM, INC., et al.,   )
 )
     Defendants.   )
 )

## <u>DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO MOTION TO DISMISS</u>

Defendants (hereby collectively "IP-LLC") file this reply to Paragon's response to IP-LLC's motion to dismiss.

## INTRODUCTION

Before addressing the arguments in Paragon's answer brief to IP-LLC's motion to dismiss, it's important to clarify some fundamental facts. IP-LLC acknowledges this Court's rule LR7.1(c) that Reply Briefs "shall directly reply to the points and authorities contained in the answering brief." However, Paragon's answer brief is substantively based on "Qualtim and Affiliates" asserting co-ownership of the Paragon Software. (*See* generally Doc. 51). But that is not the case. Paragon is improperly lumping all the Defendants together. Qualtim already agrees with Paragon's contention that Qualtim and its family of businesses do not co-own the Paragon software. Inspired Pursuits, LLC is claiming ownership rights in the Paragon software, not Qualtim and its family of businesses. The claim arises out of the Grundahls' fiduciary duty being members of Inspired Pursuits, LLC ("Inspired Pursuits"), which is a company that Daniel Holland co-founded with the Grundahls. Therefore, this reply will have issues discussed from the opening brief as well as the Paragon's Response Brief. To reiterate the proper parties, Defendants collectively herein will be

referred to as "IP-LLC," except for when the discussion warrants the identity of a specific entity or individual.

> **I.**    **Paragon was notified that Qualtim and its Family of Businesses is distinct from Inspired Pursuits, LLC. Although there's a connection between the owners, Plaintiff maintains the burden to establish personal jurisdiction over each defendant.**

Kirk Grundahl emailed Stephen Kabakoff on May 29, 2024 affirming the rights of Inspired Pursuits, LLC, a company that Dan Holland co-founded with the Grundahls. This email was introduced as evidence by Paragon in their Complaint (*See* Doc. 1, Doc. 1-10, p. 18) but then turns around to accuse Qualtim of contending co-ownership of the software. This is tantamount to Dan (who was the sole founder of Paragon) suing Dan (a founding member of Inspired Pursuits, LLC).

To further clarify the parties here, there are two exhibits that must be viewed alongside each other. Below is a snapshot from the Operating Agreement of Inspired Pursuits, LLC that Dan signed with the Grundahls. This is taken from Doc. 50-5, page 2. This is followed by a snapshot from a Memorandum Kirk sent to Stephen Kabakoff, Paragon's counsel (Doc. 1-10). It confirms that there are no claims asserted by Qualtim or the Grundahls as individuals. The connection between Dan, Kirk, and Suzi will be discussed in greater detail in this reply.

**Exhibit 50-5 Inspired Pursuits, LLC Operating Agreement:**

> **IV. MEMBERS**
>
> SECTION 1. The name of the initial Members, their capital contributions, and percentage interest are as follows:
>
> | | | |
> |---|---|---|
> | Daniel N. Holland | $100,000 | 50% |
> | Suzanne Grundahl | $50,000 | 25% |
> | Kirk Grundahl | $50,000 | 25% |

Exhibit 1-10 p. 18

> **Conclusion**
> IP-LLC is the owner of IP and TS, which includes, but is not limited to, all software, software design, engineering analysis, testing, and related IP information and data that supports the creation of innovative truss design and truss manufacturing software and methods.

As illustrated above, Inspired Pursuits is a distinct entity apart from Qualtim and its Family of Businesses. Therefore, Paragon cannot lump all Defendants together. In regards to Inspired Pursuits, Paragon must allege personal jurisdiction for Inspired Pursuits separately from Qualtim and its Family of Businesses. *Atlantigas Corp. v. Nisource*, Inc., 290 F. Supp. 2d 34 (D.D.C. 2003)

### II.     The invoice Paragon introduced as evidence does not support personal jurisdiction for Inspired Pursuits but supports the partnership between Kirk, Dan, and Suzi

Paragon asserts in both the Complaint and its Response to the Motion to Dismiss that Paragon paid Qualtim several hundred thousand dollars for engineering and consulting services. (Doc. 1 ¶ 4, Doc. 51 ). With the Response, Paragon presented for court record an invoice showing payment to Qualtim regarding Paragon. The invoice they presented as Exhibit 8 (Doc. 51-8) directly refutes their main arguments: a) that there was no connection between Paragon and Inspired Pursuits, LLC. (Doc. 1 ¶ 5), b) the Grundahls needed to solicit Paragon's business (Doc. 51, p. 19), and c) IP-LLC derived income from targeted business activity in Tennessee (Doc. 51, p. 19-20).

Exhibit 51-8 invoice shows that Clearspan Components, Inc. ("CCI") paid IP-LLC, specifically Qualtim. Paragon did not pay Qualtim. Suzi's email (Doc. 51-8 p.2) also states the following:

Hi Dan,

I talked with Kirk last night and he is in agreement with our recommendation so here is our invoice for support of Paragon software development, Let me know if you would like me to make any edits to the description of services,

Dan approved the Qualtim "2112 Clearspan Invoice.pdf" invoice and its description for reasons that suited CCI's needs. Not Paragons. For further clarification: Paragon has already stipulated that CCI is owned by Dan Holland (Doc. 1 ¶ 2). Paragon also stipulated that Dan Holland co-founded IP-LLC with the Grundahls (Doc. 1 ¶ 38). In addition, it should be noted that Inspired Pursuits was founded in 2017, and not 2022 as the Complaint states (Doc. 1 ¶ 5, *See* Reply Exh. 2.) This is the actual connection between Dan and the Grundahls. A connection that goes as far back as 1999 but specifically to the software, the 2009 invoice, which ironically Paragon also presented but likely forgot. (*See* Doc. 1-10, p. 10 and Doc. 50-3 ¶ 47). It will be clarified below.

The invoices Paragon submitted as evidence should be viewed alongside each other starting with Exhibit 51-8:

Compare this to Complaint, Doc. 1-10, p. 10. denoting the 50% Qualtim Share since 2009.

Attached here are further invoices supporting this position should the court find that the Exhibits to the Complaint are improper evidence under Federal Rules of Evidence 408 as will be discussed below. (*See* Reply Exh. 3-4).

The 2009 invoice show the origins of the Paragon software. It begins from Dan working with Computrus, Inc. At that point, Qualtim under Kirk's leadership worked with Dan in growing that idea as a 50/50 partnership, which became Inspired Pursuits, LLC in 2017, where the acronym, IP-LLC, was a play on words with respect to intellectual property (IP) (*See* Doc. 50.4, ¶ 18). This explains why the invoice is noted "Qualtim share 50%."

This was a conversation that occurred regarding the purpose of the invoice. To give some context to that conversation, its important to compare the two invoices, Exhibit 51-8 and 1-10. It supports two points: a) there was a partnership between Dan, Kirk, and Suzi going as far back as 2009 and b) John's absence in these business strategy conversations and meetings is a critical fact to remember throughout this brief as well as this proceeding. John's declaration brings this whole litigation into focus when he states as fact that the "ownership claims were contrary to his understanding." (Doc. 51.1, ¶ 22)

The invoices Paragon presented also refutes Paragon's argument that Kirk and Suzi solicited and pursued a business relationship with Paragon. (Doc. 51 p. 11, 12). There was no need to solicit a business relationship from Paragon because John Holland's father, Dan, was already in a business partnership with Kirk and Suzi since 2009. As noted above, the creation of Inspired Pursuits, LLC was born out of that 2009 partnership.

**III.  Reasonable inferences cannot be drawn in favor of Paragon because of material omissions in its factual allegations**

A. *Paragon omits the existence of a nondisclosure agreement signed by Paragon president, John Holland, and 10 other employee*

In Paragon's response to the motion to dismiss it states that "in March 2024, at the Grundahls' urging, Ms. Grundahl and Qualtim employees Keith Hershey and Ryan Dexter held a video call with employees of Paragon in Tennessee. (Doc 51-1 ¶ 22.) During this call, Ms. Grundahl, Mr. Hershey, and Mr. Dexter informed Paragon that Qualtim and Affiliates claimed to own Paragon's intellectual property, including the Paragon Truss Software." What is left out is what the memo actually said and the following important concepts (Doc. 1-8):



Paragon asserts in its Complaint that IP-LLC never took steps to protect proprietary information embedded in the software. (Doc. 1 ¶ 120). IP-LLC has provided evidence that this allegation is in fact dishonest because John Holland as Paragon president and all Paragon employees, except Matt Van Stelle, signed a non-disclosure agreement in August 2023 during a Paragon/CCI/Qualtim Summit meeting held in Wisconsin. (Doc. 22-3). The Paragon staff NDAs are attached as Reply Exh. 5. (See also Kirk and Suzi declarations, Doc. 50-3 and 50-4).

The NDAs fit into John Holland's timeline when he stated in his Declaration that Paragon was getting ready for market release by the end of 2023. (Doc. 51-1, ¶ 10). Once again, Paragon undermines its own position with this admission. Paragon appears to be purposely and knowingly withholding important and material facts from the court.

B. *Paragon omits the fact that Dan Holland, John's father was at the October 15, 2016 meeting in Tennessee*

Paragon wants to establish that the relationship between Paragon and IP-LLC related companies was a work-for hire arrangement, thus, plucking out the personal relationships between parties. In its response to IP-LLC's motion to dismiss, Paragon presents a narrative that Kirk and Suzi Grundahl met with John Holland at Paragon offices to "solicit a business relationship." (Doc. 51, p. 20). John Holland knowingly omits the fact that his father, Dan Holland, was at the October 15, 2016 meeting. Dan was at the Paragon meeting where, as a component manufacturer, he was also en route to the structural building component industry's tradeshow, Building Component Manufacturer's Conference (BCMC) tradeshow, which began with BCMC Build the weekend before BCMC In 2016, BCMC was in Knoxville, Tennessee. Dan, Suzi, and Kirk are all in the SBCA Hall of Fame and were actively involved in BCMC Build and BCMC. (*See* Reply Exh. 6-7).

The tradeshow was set to begin on Tuesday, October 18, therefore the meeting was held the weekend before the tradeshow, Saturday, October 15, 2016. *Id.* in Chattanooga, TN. Driving to BCMC from CCI, in Meridian MS, was logical given that Paragon was right on the way to Knoxville. (*See* Reply Exh. 8). Dan was the originator of and thus a strong proponent of BCMC Build and BCMC as disclosed by the SBCA, the trade association responsible for BCMC. (*See* Reply Exh. 9).

The meeting with John was due to the personal relationship that grew over the years between Dan, Kirk, and Suzi. Dan naturally wanted his close friends to meet with his son and wife at a casual meeting that was a natural part of the trip to BCMC from Meridian, MS to Knoxville, TN, where Kirk and Suzi were also headed.

Paragon cannot argue that attending the trade show raises personal jurisdiction because it is already set in case law that attending a trade show does not confer personal jurisdiction. *Miller Indus. Towing Equip. Inc. v. NRC Indus.*, No. 1:19-CV-00095, p. 5, 2020 WL 1897171 (E.D. Tenn. Apr. 16, 2020). Paragon accuses IP-LLC of "verbal gymnastics" but it appears Paragon is trying fact gymnastics here in an attempt to paint a false narrative.

The personal closeness between Dan, Kirk, and Suzi grew over the years where Dan would share personal family information with the Grundahls. Attached as an Exhibit (*See* Reply Exh. 10) is an email that Lisa Holland sent to her husband and children. The email attached a picture of a bald eagle spotted in their neighborhood. Dan, out of his friendship with Kirk, forwarded the email to Kirk. There's a common saying that goes, "You know a person is your best friend when they're among the first you tell any news." That was the connection between Dan and Kirk.

This family email is only a sneak preview of the close enduring friendship and business relationship that grew between Kirk, Dan, and Suzi. Should this litigation continue, IP-LLC has an arsenal of supporting documents to prove that when it came to Dan's business goals and vision, Kirk and Suzi knew Dan's strategic vision for the IP-LLC business better than anyone. Paragon's allegations that the Grundahls seized an opportunity upon Dan's death to improperly claim the software at issue is based on John being kept out in the dark about the entire vision of Inspired Pursuits, LLC by his Dad. Perhaps in time, Dan would have brought John in for the critical business strategy meetings but unfortunately, Dan's passing was sudden and unexpected. Therefore, Kirk and Suzi were merely performing their fiduciary responsibility as it relates to the IP-LLC business,

which was also advocating for Dan and Kirk's IP-LLC business vision where the IP-LLC trade secrets and intellectual property were to be utilized by CCI, DrJ and Paragon to create a competitive advantage in the structural building component industry market as follows (see Doc. 1-10 p 11, Reply Exh. 23)



Considering John graduated college in 2014, John was possibly still in middle school while his Dad and the Grundahls were already collaborating together and building the vision that eventually would lead to the creation of Paragon, with which the Grundahls were intimately familiar. (*See* Reply Exh. 11). Unless Paragon is calling this court to set precedent that a person automatically waives personal jurisdiction when they meet their friend's kid, the October 15, 2016 should not be considered in the personal jurisdiction analysis.

   C.  *Keith Hershey's visit to Paragon was incidental to his route visiting customers in North Carolina and Alabama that week.*

As already emphasized above, there was no need to solicit Paragon's business. Keith Hershey did not purposely target this visit to Paragon. As Qualtim's general manager, Keith Hershey frequently visits customers. WeaverCooke[1] is a Qualtim client located in Greensboro,

---

[1] Weavercooke, https://www.weavercooke.com/ (last visted on December 16, 2024)

North Carolina. CH Machine[2] is a Qualtim client located in Vernon, Alabama. In November 2016, Keith was traveling by car from Wisconsin to North Carolina and Alabama. As a courtesy and out of the established partnership between Kirk, Dan, and Keith as referenced in Reply Exhibit 12, it would be the proper gesture for Keith to stop by the Paragon office in Tennessee, since it was on the way.

Since John Holland worked directly under the supervision of his Dad right after high school, this concept of business relationships built on friendship might be lost on him. There was no solicitation of business in that situation. Other sections of this reply strongly demonstrate and substantiate the existing partnership between Dan and Kirk's companies and their staff. John being a late comer to this the already existing relationship would likely not understand the state of affairs between Dan and his long-time colleagues.

Again, unless Paragon is calling this court to set precedent that a person automatically waives personal jurisdiction every time a person suggests that business partners develop friendships, the November 16, 2021 meeting should not be considered in the personal jurisdiction analysis.

### IV. Reasonable Inferences should not be drawn in favor of Paragon due to its arguably frivolous explanation to the court of how the software works.

In Paragon's response to the motion to dismiss, Paragon minimizes the significance of engineering work underlying the software when it stated: "Paragon wanted to consult with engineers about engineering standards and to validate the accuracy of the equations in its software…Paragon could have obtained these services from various engineering companies" (Doc. 51 p. 11). This statement shows that neither John Holland nor his attorneys comprehend how the software or the truss industry works.

---

[2] CH Machine, https://www.chmachineinc.com/ (last visited December 16, 2024) - Notice DrJ is shown on the home page

Paragon stipulates the business model of the software is "to connect truss designers with engineers, component sellers, and truss builders. Paragon wanted to sell its software services to truss designers and builders around the country." (Doc. 51 p. 10). Traditionally in the truss industry, plate manufacturers supply the software on the condition that truss manufacturers purchase only that specific manufacturer's plates. (*See* Reply Exh. 13). MiTek is among the most widely used truss plate manufacturer in the industry. (*See* Reply Exh. 14) MiTek provides its own proprietary software to its clients, such as CCI (who was a MiTek customer prior to and after MiTek's purchase of CompuTrus, *See* Reply Exh. 3 and 15)). MiTek is a professional engineering company and employs its own licensed professional engineers. (*See* Reply Exh. 16)

Dan founded Paragon to give CCI the ability to exist outside that traditional structure, hence, Paragon's homepage states that anyone can "design and analyze any truss using any plate for any shop." (*See* Reply Exh. 17). However, as the Truss Plate Institute states, each truss plate manufacturer, in order for trusses to be sold into US commerce in conformance with the professional engineering regulations of each state, "they must employ or retain the services of a registered professional engineer knowledgeable about metal connected wood trusses and agrees to contribute engineering expertise to and participate in TPI technical programs." (*See* Reply Exh. 18) The business path Paragon is on right now is contrary not only to Dan's vision but does not follow industry requirements, building code and engineering regulations as they relate to public safety. The software cannot possibly be independent because it needs professional engineering supervision, by the engineers, DrJ in this case, using their creative application of scientific knowledge, physics, mathematics, and problem-solving skills to design or develop structures.

MiTek illustrates in an open letter how the software and engineering works. (*See* Reply Exh. 19). The data inputs from truss designers is extracted and then run "from scratch" by professional engineers. *Id* at 2. This ensures that when professional engineers seal a design, they

are sealing work that they prepared and meets applicable building code and professional engineering regulations. *Id*. This is the very reason MiTek employs professional engineers. *Id*. When Paragon data is extracted, it is concerning as to who are the professional engineers are with respect to undertaking professional engineering given the professional engineering responsibility to conform to all building code and professional engineering regulations. Dan addressed this by leaning on his partnership with Kirk. Below is a snapshot of a conversation between Paragon staff, Dan, and Kirk. This is attached as Reply Exhibit 20. Notice how Dan defers to Kirk's engineering judgment.



Dan replies deferring to Kirk because Kirk prescribes the method Paragon uses.



This conversation contradicts two assertions of Paragon in its response to the motion to dismiss: a) that Paragon could have obtained the consulting services from other engineers, and b) Qualtim's relationship was in a limited consulting capacity or work-for-hire arrangement. Flowing

from the 2009 invoice is this 2023 conversation showing the alliance between Dan and Kirk when developing the software.

Dan was knowledgeable of the Truss Plate Institute's requirement of engineered truss design be under professional engineering supervision and control. TPI members are mandated to "employ or retain the services of a registered professional engineer." Furthermore, ANSI/TPI 1 2014 states that "Chapter 3 of this Standard is the quality standard for the manufacturing processes of metal-plate-connected wood Trusses, and shall be used in conjunction with a manufacturing quality assurance procedure and a Truss design. These provisions shall be included in the In-Plant Quality Assurance Program of each Truss Manufacturer."

Public safety requires accurate load path resistance performance. When engineered trusses are used, pursuant to all construction regulations, for resisting applied loads, the process requires an engineered truss design drawing, an in-plant quality control manual, a truss manufactured in accordance with the truss design drawing and a third-party quality assurance evaluator. For CCI, DrJ provided the professionally engineered truss design and CBI provided the third party quality assurance. The Paragon software as its stands, unless its stripped down to standard public domain Engineering-101-textbook" truss design mathematics, contains the expertise and trade secrets housed under Inspired Pursuits, LLC, a partnership between Dan, Kirk and Suzi.

## V.   Dan Holland did not include John in business strategic meetings. He included his business partners, Kirk and Suzi and at times Keith Hershey.

Dan was working with Kirk to build the Paragon business model and he was not including John in all of these discussions. Furthermore the decisions being made on behalf of Paragon were being made by Dan and Kirk as the Paragon-DrJ team decision-making peers (*See* Reply Exh 21.) . To further illustrate this, when Dan was working on the Paragon business model, he didn't involve John in Paragon business development meetings. He partnered with Kirk, Keith and Suzi. (*See*

Reply Exh 22.) This is one example of an executive level conversation regarding the value of the "Paragon-DrJ" team.

There was no big pomp and circumstance as Dan and Kirk were setting up meetings with key industry players and John was not at the table. Dan, Kirk, and Suzi understood the industry extremely well and together, they moved stealthily in building Paragon. Inspired Pursuits, LLC was not publicized until the filing of this Complaint, when Paragon improperly posted the Memorandum repeatedly marked "Confidential Information and Trade Secrets."

John Holland wants to pretend that his father's relationship with Kirk and Suzi only extended to being service providers, hence, it was likely very shocking to him that his father formed an entirely distinct business entity with Kirk and Suzi. When the Grundahls pressed to meet with him and the family shortly after Dan passing, it was out of abundance of understanding what Dan would have wanted for Paragon. Aside from Kirk and Suzi's declarations regarding championing Dan's vision for the trifecta of CCI/Paragon/DrJ (*See* Reply Exh. 23), it would be reasonable for this court to infer that Dan's vision for the software was an innovative partnership between the owners of the three entities, called Inspired Pursuits, LLC where, as mentioned above, the acronym, IP, was thoughtfully intended – intellectual property (IP).

### VI. Paragon's Counsel violated Federal Rules of Evidence 408 when it submitted for evidence confidential settlement communication, thus, the communications should not be considered for personal jurisdiction analysis

Conduct or statements made in settlement negotiations cannot be admitted into evidence to prove or disprove substantive elements of a claim. Fed.R.Evid. 408. The public interest in favor of secrecy applies even in informal settings between the parties. *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.,* 332 F.3d 976, 980 (6th Cir. 2003).

However, if the court sets aside the rule violation, Paragon's analysis of the *Trimble* case falls short. Although enforcement emails can provide a basis for personal jurisdiction, the court

lists other actions and the substance of the communication to be considered. Paragon assertion that the 22 emails Kirk sent to Paragon's attorneys were analogous to the *Trimble* case. As compelling as that may sound as part of their fact gymnastics, the argument is flawed because many of those emails were in response to Paragon's emails. Contrary to Paragon's cited case, *Trimble Inc. v. PerDiemCo LLC,* 997 F.3d 1147, 1156 (Fed. Cir. 2021), IP-LLC did not reach out to *offer* [emphasis added] negotiation discussions. The settlement discussion was already happening.

In *Trimble,* the defendant sent an unfiled complaint and advised of the attorney representing them in the lawsuit which is in stark contrast to the communication here where Paragon's counsel advised that while the discussions are taking place, Paragon would restore "Defendants' access to the Paragon software." (*See* Reply Exh 24). Another email was sent to follow up on the access as it had not taken place as agreed. Each document attached to emails that were being exchanged were conspicuously marked in the footer as "Confidential Intellectual Property is protected by Defend Trade Secrets Act 2016, © 2024 Qualtim, Inc. and/or Confidential Intellectual Property is protected by Defend Trade Secrets Act 2016, © 2024 Inspired Pursuits, LLC" furthering the point that the communication was in the course of settlement negotiations. Making them public is in violation of F.R.E. 408 and should not be considered for the purpose of personal jurisdiction analysis.

### VII. Over 900 sealed engineering drawings Paragon alleges is work DrJ clients who are not in Tennessee and it is de minimis to how much sealing DrJ did in that time frame

In Paragon's response to the motion to dismiss, Paragon raised the 900 created, copyrighted and sealed truss designs that DrJ prepared and sealed in Tennessee from 2016 to 2024. (Doc. 51, p. 12). This is another attempt of Paragon to stretch the truth. In the span of about eight years, based on DrJ's billing data, DrJ sealed more than 1,200,000 truss design drawings, making these 900 trusses less than one percent of seals. (*See* Reply Exh. 25)

Considering this ratio, it is hardly "purposeful availment." Nothing was fortuitous in DrJ's contact with Tennessee. Kirk and Suzi's declarations remain true that IP-LLC do not have clients in Tennessee. Qualtim or DrJ clients may have truss manufacturing clients who sporadically do business in Tennessee but it remains true that IP-LLC have not targeted activities in Tennessee. Therefore, the issue of 900 sealed plans should not be used for the purpose of the personal jurisdiction analysis.

**VIII. Not joining Clearspan and the Estate of Daniel Holland puts IP-LLC at a substantial risk of incurring multiple or inconsistent litigation and their declarants, Rob Eason and Marvin B. Speed are likely in violation of their fiduciary duties**

Paragon's argument that the Court here could not afford complete relief among existing parties misses the mark. As illustrated above and explained here, the connection between CCI and Dan Holland relates to the software at issue here. Paragon minimizes the part of the rule focusing on the risk of existing parties to incur multiple or inconsistent obligations.

A.   *IP-LLC and the risk of multiple litigation*

Rob Eason and Marvin B. Speed foregoing CCI and the Estate's interest in the software is another "procedural fencing" strategy by Paragon. First, their declaration is based on the presumptuous belief that Paragon will prevail in this litigation. Second, Paragon wants CCI and the Estate in their back pocket to take IP-LLC back to court in the event they are not successful in this case.

If IP-LLC prevails here, CCI would have standing to sue IP-LLC for its joint venture in the software. CCI would have standing because CCI paid Qualtim on an invoice that denotes a 50/50 partnership. Alternatively, if IP-LLC prevails in this action, the Estate would have standing to take IP-LLC back to court for Dan Holland's interest in Inspired Pursuits, LLC.

B. *Rob Eason and Marvin B. Speed each hold a fiduciary duty to the entities they manage*

Rob Eason and Marvin Speed's declaration state that they will not assert any interest in the Paragon software is likely in violation of their fiduciary duties to the entities they administer.

Officers of a corporation owe a fiduciary duty to the corporation and its shareholders. *Qayyum v. PharmaPhD, Inc.,* No. 1:19-CV-00306-SKL, 2020 WL 12840092 (E.D. Tenn. Apr. 27, 2020). CCI invested a significant amount of money with respect to developing the Paragon software as shown in the invoices. As stated above, it was CCI who paid Qualtim and not Paragon.

There is a high likelihood that Paragon's current business model will financially cripple CCI if CCI abides by professional engineering and building code regulations. (S*ee* Reply Exh. 13, 19). It would be a violation of Rob Eason's fiduciary duty to the corporation if Rob Eason does not assert CCI's interest in this litigation. CCI has been owned by the Holland family since John Holland's maternal grandfather. (*See* Doc. 51-1 ¶ 3). Without disclosing key trade secrets for public court record, Rob Eason's negligence in asserting CCI's interest in the software and in this litigation will damage CCI.

Similarly, Marvin Speed, as the executor of Daniel Holland's estate, owes a fiduciary duty to preserve the assets of the estate. *Harper v. Harper*, 491 So. 2d 189, 199 (Miss. 1986). Daniel Holland is a majority member of Inspired Pursuits, LLC, as evidenced in the operating agreement. (*See* Doc. 50-5 p. 2). A quick snapshot of Inspired Pursuits, LLC members is below:

**IV. MEMBERS**

SECTION 1. The name of the initial Members, their capital contributions, and percentage interest are as follows:

| Daniel N. Holland | $100,000 | 50% |
| Suzanne Grundahl | $50,000 | 25% |
| Kirk Grundahl | $50,000 | 25% |

Under Mississippi law, an executor of an estate has a duty to "reduce to possession the personal assets of the testator." *In re Estate of Carter,* 912 So. 2d 138, 144 (Miss. 2005). This Court should join the Estate of Daniel Holland in this litigation.

### IX. PARAGON'S ALLEGATIONS OF IP-LLC FORUM SHOPPING IS UNFOUNDED AS THIS LAWSUIT WAS FILED ON A PREEMPTIVE PURPOSE WHICH COURTS HAVE RULED INAPPROPRIATE FORUM SHOPPING

In Paragon's response to the motion to dismiss, Paragon accuses IP-LLC of blatant improper forum shopping in an attempt to minimize their "inappropriate forum shopping" when they filed this action. *Catholic Health Partners v. CareLogistics*, LLC, 973 F. Supp. 2d 787, 795 (N.D. Ohio 2013). Paragon's actions prior to filing this lawsuit was merely for "procedural fencing." Id at 794. As discussed above, the parties were in the middle of settlement negotiations and discussing the nature of the dispute. Paragon would have "incurred no further loss while settlement negotiations continued." *Id* citing *AmSouth Bank v. Dale*, 386 F.3d 763, 786 2004 WL 2092997 (6th Cir. 2004).

Stephen Kabakoff, Paragon's counsel, sent an email on June 21, 2024 seemingly to follow up on documents he had already received. (*See* Reply Exh. 24, which is the start of Kabakoff induced email exchange). Amidst this discussion and without any further communications, Paragon filed this lawsuit in a blatant attempt to avail themselves of the first-to-file rule. But the "federal declaratory judgment is not a prize to the winner of the race to the courthouse." *Catholic*, 973 F. Supp 2d at 792. After promising a reply in his May 29, 2024 email ("…To provide sufficient time to respond, we will endeavor to have our client's response to your letter and demands in the next 7-10 days or sooner if possible…"), no client response was sent (See Reply Exh. 24). Mr. Kabakoff stopped all communications in the middle of settlement discussions and filed this lawsuit. This lawsuit was clearly filed in an anticipation of IP-LLC's actions, which is

an aspect of forum shopping courts disapprove. *Id.* Similar to the *Catholic* court, the court here should not reward Paragon as the first-filer by allowing them to select the forum of their choosing, because they are not the natural plaintiff. *Id.* They were not incurring further damages by participating in further settlement discussions. On the contrary, IP-LLC continued to incur damages.

As discussed above and illustrated by the chain of emails between Mr. Kabakoff and Kirk, Paragon was in control as to the access to the software. The software contained IP-LLC intellectual property, DrJ professional engineering knowledge to support compliance with professional engineering regulations, and DrJ copyrighted truss designs. Paragon unilaterally, and without any warning, cut off IP-LLC's access to its own client files. Prior to this lawsuit, there is clear and convincing evidence regarding the partnership between Clearspan and IP-LLC. However, Paragon conspired with Clearspan and Dan Holland's estate to unilaterally sever those ties. The Wisconsin case claims $23 million in damages due to Paragon's actions. Whether Paragon or IP-LLC prevails in this lawsuit, Paragon violated Wisconsin contract laws and caused (and continues to cause) severe financial loss to IP-LLC. (Document 51-18).

The Uniform Declaratory Judgement Act was adopted into statute to create a remedy that provides parties access to the court system before money loss has been suffered or criminal penalties are involved. Hence, 28 U.S.C. §2201 is titled "Creation of Remedy." At the time the lawsuit was filed, Paragon had not incurred any financial loss and there is no evidence that it would have suffered any financial losses. Paragon is still in beta testing and can still proceed accordingly. On the other hand, IP-LLC has already sustained financial loss and properly availed themselves of remedy through the courts.

Under the *Grand Trunk Test,* this court would find the factors yield to the conclusion that it exercising jurisdiction over this matter is not appropriate under the Declaratory Judgment Act.

*Boyd v. Martinez*, No. 22-6026, 2023 WL 4903173 (6th Cir. Aug. 1, 2023). The *Boyd* court analyzed the following factors:

> (1) whether the declaratory action would settle the controversy;
> (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;"
> (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and
> (5) whether there is an alternative remedy which is better or more effective.

As mentioned above, IP-LLC has already suffered financial injury so this declaratory action would not settle this controversy. Because the controversy would still continue whether this court finds that Paragon prevails in this lawsuit or not, this declaratory action would not serve a useful purpose. Third, based on the very faulty Complaint Paragon filed where it contradicts itself and omitted key facts, this action was filed as a race to the courthouse. The Wisconsin case is filed due to a violation of state law, this declaratory action is irrelevant except for the purpose that this court should transfer this case to Wisconsin. At the time of this filing, Paragon has neither offered or accepted continuous resolution discussions. IP-LLC is open to this court's suggestions on alternative remedy options such as mediation.

Based on Paragon's response to IP-LLC motion to dismiss, Paragon seems amenable to transfer this case to Wisconsin in place of a full dismissal and IP-LLC would agree.

## CONCLUSION

IP-LLC understands precedence requires this court to view the alleged facts in light most favorable to the Plaintiff. However, the court is not pegged to this analysis as it is not required to construe the allegations in favor of Paragon when the facts are unwarranted.

John's declaration admits that the software ownership was contrary to his understanding (*See* Doc. 51.1 ¶ 22). As explained and illustrated above, it was because Dan did not give John a

seat at the table regarding business strategies. Since 2009, it was always Dan, Kirk, and Suzi developing and implementing business strategy. It is lamentably evident that John did not know the extent of his father's career and fostered relationships. After all, he went to college and then worked on the software under the guidance of his father who was sadly taken too soon. (*See* Doc. 51.1 ¶5).

For the reasons stated above, IP-LLC requests a dismissal of this case or a transfer to the state of Wisconsin.

Respectfully submitted,

By: s/Mayville Larosa
        Mayville La Rosa *(pro hac vice)*
        Law Office of Mayville La Rosa, Esq.
        718 Sugar Maple Lane
        Verona, WI 53593
        Phone: (608) 800-7353
        mlarosa@kfinnovations.com

        Michael J. Bradford, BPR #22,689
        LUEDEKA NEELY, P. C.
        900 South Gay Street, Suite 1504
        P.O. Box 1871
        Knoxville, TN 37901-1871
        Phone: 865-546-4305
        mbradford@luedeka.com

        *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of December, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

s/Michael J. Bradford
Michael J. Bradford
